25-113, 1-1-1-3. Mr. Einstein. Welcome back. Thank you, Your Honors. May it please the Court again, I'm Drew Einstein for the United States. I'd like to, if I can, kind of pick up with those jurisdictional bars, starting with 1252G. That provides that notwithstanding any other provision of law, statutory or non-statutory, and specifically identifies Haiti's statutes, no court shall have jurisdiction to hear any cause or claim on behalf of an alien from decision or action by the Attorney General to commence proceedings. And so, the Supreme Court's decision then in Reno makes these violations particularly manifest here. There it is here. Appointees challenge initiation of proceedings against them, arguing that it violated the First Amendment. And the Supreme Court explained that, quote, respondents challenge the Attorney General's decision to commence proceedings against them to fall squarely within 1252G. Indeed, as we have discussed, the language seems to have been crafted with just such a challenge precisely in mind here. I think that whole thing is controlling because what you have here is a challenge, again, to— You're talking, Reno, AADC. That's correct, Your Honor. But that was a challenge to removal, not detention. That's correct, Your Honor, but here there are First Amendment challenges being brought, and it's the same First Amendment challenges— Right, so that just gets us back. I mean, it's the same, or there's at least substantial substantive overlap. I think the government concedes. It was clearest in the reply in Madawi that you don't resist that there's habeas jurisdiction for conditions of confinement claims, right? That's correct, Your Honor. There could certainly be substantive overlap with arguments, claims being made with respect to conditions of confinement as to removal. Let's say somebody argues that they are being targeted for removal based on religious discrimination, and then they also argue that their detention is unlawful in light of religious discrimination that go to conditions of confinement. That substantive overlap, we don't have a jurisdiction stripping provision as far as I can tell, and we need a clear statement rule that says where there's substantive overlap between different claims, one attacking removal and one attacking detention, that there's no jurisdiction with respect to detention. Your Honor, I think to the extent that a claim would necessarily imply the illegality or constitutionality of the decision to initiate removal proceedings themselves, then that's necessarily barred as well, and I think this Court's decision in Delgado is instructive on that, where it was a case designed to force action on an I-212 application, which would have indirect effects on removal proceedings, and this Court recognized that those indirect effects would have, therefore, triggered the applicable jurisdictional bars. I think as well, and I have to be a little careful with this, but the Ragger case is instructive on this. Careful because we don't know what if it is still the law. Exactly, precisely, Your Honor. And so that is vacated, so it's just advisory authority even upon this panel, but that certainly recognized a similar sort of bar where the claim was that, and that was a final order of removal but also within 1252G, therefore, that the way that it was being carried out was unlawful, and this Court recognized 1252G applying, explaining that, quote, to remove that decision from the scope of 1252G because it was allegedly made based on unlawful considerations would allow plaintiffs to bypass 1252G through mere silence of their complaint. What's counsel to do if all he or she knows is that the client is in transit going from state to state? Where should the petition be filed in those circumstances? And the government won't tell counsel where the client is because of these policy reasons yourself? Your Honor, certainly the cautionary note that that's not presented in modality. I think the answer to that would be that the unknown custodian exception could apply if it was a long period of unknown where it's something very short. What's a long period of unknown? How long is long? Your Honor, it certainly would have to be more than 24 hours of the 12-hour presented in the Ostern case. I think there's— A day, two days, a month? I think a month would certainly be excessive. That would raise factual questions about whether or not it was a transfer. I'm not sure exactly where those cases are drawing the unknown custodian line, but it's nowhere near— Suppose it's sort of flying this young woman to Louisiana. They've driven her. Would the petition be— Could the petition be filed in any state that she went through and counsel learned of that? Your Honor, I think Padilla suggested that venue would be appropriate where the physical sight is of the person in that instance. In that sort of scenario, the custodian rule might— It's tricky to say how that would apply. I mean, you concede it should have been filed in Vermont at the time it was filed. That's correct. Under the venue provision of the District Rule of Padilla, that certainly follows straightforward as an application of the Supreme Court's rule that the only district that has jurisdiction is the one where they're physically present. Of course, the end-no exception can apply if someone, you know, after validly acquiring jurisdiction— And for Madawi, we don't have this issue. Not at all, Your Honor. There are no hideous sort of venue issues presented in Madawi. Does the government contest that the speech in both cases was protected speech? What's that, Your Honor? Does the government contest that the speech in both cases was protected speech? Your Honor, we have not taken a position on that. Our position is that the jurisdictional bars, you know, prevent adjudication of that. I'll note, though, that in— Help my thinking. Take a position. What's that? Help my thinking a moment. Take a position. Your Honor, I don't have authority to take a position on that right now. But I'll note that in Reno— I suppose in that sense it's not contested. Not contested specifically in those proceedings because our arguments have been based on the jurisdictional bars rather than the underlying merits. So it's not contested in these two proceedings? As to these proceedings right now before you, that's correct. Our arguments are that the Congress's jurisdictional bars— I guess you're saying it's neither contested nor conceded in a way. I would also say it's not a live issue. We are raising them based on the jurisdictional bars. I'll note, too, though, that in Reno v. AADC, the Clinton administration conceded that part of its motivations for seeking removal were, in fact, based on the First Amendment, and that ultimately did not carry to that end. Well, turning back to Reno and then Regents, reading on it, and the focus on—in 1252G, that's a narrow provision focused on commencing proceedings, adjudicating cases, and executing removal orders. That gave me a pause in thinking about exactly how to read those terms, which could be understood very broadly or very narrowly. But then in Regents, we're told that we previously rejected as implausible, the Court said, the government's suggestion that 1252G covers all claims arising from deportation proceedings or poses a general jurisdictional limitation. And it seems to me, following up on Judge Nathan's questions about conditions of confinement and overlapping claims, that the focus here on detention proceedings you're really rejecting because this is all part of some of her objections to the removal, or what you expect to be her objections to removal at all. But shouldn't we have the narrower reading of commencing proceedings that the Court has instructed us to give in Regents? Your Honor, I agree that 1252G is certainly narrower than A5 and B9. But here what you have is a challenge based on the First Amendment that applies equally to the decision to initiate removal proceedings and to detain. But the fact that the arguments are the same doesn't mean that the act of the government in detaining is the same as the act of the government in removing. Detention is a separate consideration and a separate decision by the government, right? There are plenty of people who get removed who have not been detained. Your Honor, I don't think that's how the Third Circuit or the El Piso or the Eleventh Circuit in Alvarez thought. I think this Court in the Delgado case recognized, too, that even things having indirect effects on challenging the validity of removal or affecting those proceedings are subject to the jurisdictional bars. I think quite just themselves have notably directly connected the decision to detain them to the decision to initiate removal proceedings. But it could be the case that an argument that someone is being detained for First Amendment-protected speech would be effectively unreviewable. I don't believe so, Your Honor, because you can— as Reno v. AADC makes clear, you could preserve that challenge as a First Amendment retaliation case in the immigration proceedings. What if they're not ordered removed? What's that? What if they're not ordered removed? If they're not ordered removed and they do not— and the immigration proceedings commence, then I think the jurisdictional bar would not necessarily apply in that instance. But their—whatever period they've been detained leading up until that is effectively unreviewable would never be subject to review. That would not be, but the decision itself could potentially be subject to other bars outside of—or, sorry, other challenge because the jurisdictional bars of the INA would not apply in that case because there's no longer—it's no longer effectively within the INA system. Okay. In particular, even if 1252G doesn't apply here, that 85 would be 9, really. Let's assume that the litigant is detained, has a First Amendment claim, and is put into removal proceedings. At what point is he or she entitled to have the First Amendment issue looked at and resolved? Your Honor, Congress has specifically challenged that to the Court of Appeals through A5 and B9 by providing that all questions, you know, that all questions of law and fact, including interpretation and application of constitutional and statutory provisions. So she would have to wait her turn in the backlog of immigration cases, which is, what, thousands of them, and then finally get to an ALJ and finally get to a Court of Appeals and finally have to wait on a court like us to decide her First Amendment challenge. Well, Your Honor, that is a deliberate policy choice that Congress is making. I understand that, but— I'm sorry. I'm sorry. But the delay would be less here. The E.O.R. and immigration judges specifically prioritize cases where people are in custody, and those are handled more expeditiously and on a much more rapid schedule than people that are not handled in custody. And neither of these petitioners is a flight risk or a danger to the communities. Is that right? Your Honor, Ms. Osterhof, I believe it's been denied bail by the IJ, including based on a flight risk determination. I believe that in the case of Mr. Madawi, he's not eligible for bail, and so that has not been adjudicated by an IJ. So we're going to turn to A5 and B9. And my question to you is that seems to do with orders of removal, and there is no order of removal here. That's correct. There is no order of removal, but it arises from removal proceedings, which is squarely within the text of B9. Here's how the Ninth Circuit describes A5 and B9. Well, but in Jennings, the court said B9 does not bar review where a party is not asking for review of an order of removal. Well, that's correct, Your Honor. But notably, Jennings itself specifically distinguished that circumstance from a, quote, decision to detain the noncitizen in the first place or to seek removal, which it thought would squarely be within B9. And this case really is a decision to detain the noncitizen in the first place, and that's Jennings 583 U.S. 294. Right, so there's an argument about whether that's dicta since Jennings didn't involve detention. Your Honor, I don't believe that's dicta because it was the Supreme Court construing scope of B9 and explaining what fell inside and outside of it. I think that's the holding. And how do you understand? It's part two of the opinion joined by three justices. Is it the holding? How do you understand it as the holding? Maybe I have it wrong. And what do you make of Regents in 2020, which omits that precise clause when quoting that portion of Jennings? Your Honor, I don't think you can make much out of ellipses. Ellipses are not holdings. They're not even dicta. Dicta about dicta, maybe. You can squint at them pretty hard, but probably not ultimately extract much out of them. But your theory is that they omitted a holding in quoting that portion of the opinion. A holding that would have had no relevance in Regents. Or in Jennings. I think it was important in Jennings because they were trying to find what fell within B9. Jennings says the applicability of B9 turns on whether the legal questions that we must decide arise from the actions taken to remove these aliens. It may be argued that if those actions had never been taken, the aliens would never be in custody at all, but this expansive interpretation of B9 would lead to staggering results. It seems to me that's precisely the argument the government's making here. Your Honor, I don't believe so. And I think the distinction that they drew in Jennings draws that out. Whereas they said that the decision to detain in the first place would be within B9, what they recognize is prolonged detention is no longer directly and intimately tied up with the decision to seek removal in the first place. It has more to do with the fact that proceedings have dragged on. Which is not squarely part of that initial charging decision. And so they recognize that that latter bit of where detention has continued to go on, they said that that was the distinction that fell outside of B9, but they carefully drew that distinction from the original one. I think this court in Velasco-Lopez drew a very similar distinction where it said it distinguished the initial one from prolonged detention saying that here Velasco-Lopez raises a due process challenge not to his initial detention but to the procedures that resulted in prolonged incarceration without a determination that he poses a heightened male risk. And so I think this court itself has also drawn that same distinction that Jennings did. That a challenge to that initial detention is bound up in the decision to seek removal. It is, after all, detention pending removal. Can I ask you... I wanted to shift to irreparable injury, if we could, and balance of equities. But please, finish the statutory points, if you'd like. Your Honor, I think we've covered B9. If I can very just quickly move on to 1252, A2, B, Romanet 2. That deals... There's been a question about the discretion. There's no question that the Attorney General has discretion as to where to cite someone. And the dispute seems to be that there's not an explicit recognition of the authority to transfer. But ultimately, the decision as to where to pick a detention site has to include that, or otherwise it's needless. It would be like saying, Your Honors, have discretion to pick where your chambers are, but no discretion in order to transfer them to, say, Albany or Syracuse or some other place. That initial vesting of discretion where to house someone in detention necessarily includes the authority to transfer them. And so, therefore, falls within that A2, B, Romanet 2 bar. I don't know if I have the case. We have cases that interpret that A2, B2 language to require kind of, again, a sort of clear statement rule, not only of a grant of authority for the Attorney General or the Department of Homeland Security, but a specified grant of a clear language as to the discretion of that authority that I think is absent from the relevant provisions that you cite, too, as part of this argument. Let me get the cases. I'm not sure that they're briefed. I think the First Circuit in Aquilar also spoke to the need for a specific statement of discretionary authority, and I have to say 1252G seems to be with the bricks and mortar. You know, you can rent facilities, you can build facilities, you take into account how many people there are and so on. It seems very unlike the kind of transfer that we're talking here, moving someone from Massachusetts to Louisiana pending removal proceedings and doing so within a very brief period of time. It seems like an odd exercise of that bricks and mortar grant of authority. I think that authority has been supplemented by Section 1231G, which provides the Attorney General shall arrange for the appropriate places of detention for aliens to deem pending removal or a decision on removal. I mean, it's not. It says shall. It's not actually discretionary language. Shall arrange. Certainly, Your Honor, there's no language that's happening, you know, how that authority is to be applied. No, but your argument is that the provision that removes court review of a detention decision is because the statute has specified discretion in the Attorney General or Secretary of Department of Homeland Security, right? Your Honor, I think it's the multiple provisions that themselves provide the authority to detain the individual at particular locations combined with the absence of any statutory language constraining that discretion. That therefore provides the ultimate discretion that is not reviewable under 1252A2E from that time. Is there anything that, in the government's view, cabins its discretion to, say, move her from Louisiana next week or putting aside these procedural issues, but anything that cabins its discretion about where to lock her up? Oregon, Texas, Florida? I don't believe so, Your Honor, and I don't believe that Mr. McDowdy cited any statutory provisions that would restrict such discretion. The case I'm thinking of, one is Nethegani v. McKasey, 532 F3rd 150. I don't know. I don't think it was briefed, but just tell me your reaction to the language if you trust that I'm quoting from it. The question is not whether a statute requires an exercise of discretion, because even when they probably do, the crux is whether the text specifies that the decision is in the discretion of the Attorney General. If a statute authorizes the Attorney General to make a determination, but lacks additional language specifically rendering that determination to be within his discretion, for example, in the discretion of the Attorney General to the satisfaction of the Attorney General, the decision is not one that is specified to be in the discretion of the Attorney General for purposes of A2B2 and Romanet 2. Your Honor, I think our reaction to that would be that the combination of the multiple provisions that provide for the Attorney General authority to detain people in a location of her choosing combined with the absence of any statutory restrictions on where that might be ultimately satisfies that provision of discretion. And just to understand the argument, the primary argument would be that this is the district court's exercise under the All Writs Act of at least a temporary... Let's start with Ms. Ozturk. With respect to Ms. Ozturk, a temporary relocation for purposes of its ability to conduct habeas proceedings. So setting aside all of your arguments about jurisdiction stripping in 2241 with respect to that. So assuming that you haven't prevailed on those, what's your answer to that sort of basic contention? This isn't a review of the decision where to house an individual for purposes of detention, but a separate exercise of the court's All Writs Act authority in order to enable it to conduct the proceedings it needs to conduct. Your Honor, I think the All Writs Act would not provide a grant of authority that could be exercised in a way that's contrary to the titling provisions. And so in Mr. Madawi's case, that's now somewhat of a secondary issue because the order to release him... Well, let me ask you. He was ordered produced to the courthouse, right? He was, and then there was the 90-day TRO, and then the... I think this court could only reach that question if it first reached the question of releasing him as a threshold, since that obviously is something that supersedes a restriction on his transfer. The greater comes to all is the lesser here because if he can lawfully be released, which of course we dispute, the transfer order is essentially moved. Briefly on irreparable injury. Certainly, Your Honor. It's a couple of things. And just... Sorry, I do want you to answer. But you came on in emergency posture. You asked for this motion to be heard on the same panel. We've moved expeditiously in granting that request. Briefing just finished last night. The stay that you're seeking is to re-detain Mr. Madawi. Do I understand that? That would be the operative effect of it. The effect of staying it would restore the government's authority to detain him. And so how do you understand irreparable injury? I'll ask this with respect to both motions. I think it's a couple of things, Your Honor. The first is that there are clear statutory jurisdictional bars. So those are your... Those are your merits arguments. Likelihood of success and merits. Well, Maryland v. King recognizes that any time the federal court enjoins a statute that the sovereign and issued error states that here the United States suffers irreparable harm. Courts have also recognized in particular... Sorry, and we're enjoining a statute? Your Honor, the effect of... Or the district court enjoined a statute? It's not enjoining a statute, but it's rendering it inoperative. It therefore has the same injurious effects but rendering those unavailable to the government. So that's a... Is there an effect saying that an adverse decision is irreparable injury to the government? Your Honor, where there are these jurisdictional bars that Congress has specifically created so that the immigration system can operate. But, I mean, you've read your opponent's briefs. I mean, these are debatable questions, you can see. You no doubt think you got the best of these arguments, but I haven't seen any argument. I mean, there are a lot of them in these papers. And, you know, you and your learned opponents are going head-to-head, so these issues are clearly debatable. Your Honor, certainly irreparable harm arguments are premised on us being likely to succeed on the merits. I mean, the standard necessarily requires that, and we believe that we are likely to do so, which I think then also goes to... But you are basically saying that an erroneous legal decision, particularly with regard to the exercise of jurisdiction, always constitutes irreparable harm to the government. Your Honor, I think certainly in this context and particularly in the immigration context where the Supreme Court has repeatedly recognized that it's an inherent aspect of sovereignty... So sometimes it is and sometimes it isn't. It depends how right the government feels it is. Your Honor, it clearly is in the immigration context because it is sovereign injury. The sovereign's inability to carry out removal operations of people that it believes should not be in the country and where its inability to exercise its lawful authority to do so is sovereign injury to the United States, and sovereign injury by its very nature is irreparable injury. And I'd add as well that, you know, if this Court thought otherwise, that mandamus is also available and has been used repeatedly to enforce jurisdictional bars... So let me just ask practicalities. If the stay is... If the government's stay is denied, what happens? If the government's stay is denied and medallied, I think that the proceedings would continue below. There would not be a... You know, he would be out on release given that that is what the district court ordered and absent a stay from this Court... And his removal proceedings would continue in parallel in Louisiana, is that...? That's my understanding, Your Honor. It would not affect... It would not, at least as of yet, although a query of whether or not the district court's decision that his custody is the product of a First Amendment violation would not necessarily imply that the decision to initiate removal proceedings against him was necessarily about... I mean, that's precisely why Congress, you know, sought to channel all of these issues into the courts of appeals following final orders of removal so that you don't have this piecemeal adjudication. But nonetheless, the district court has indicated a willingness and indeed a strong desire to move very quickly in both of these cases. And it seems certainly possible in the ordinary world that he would be able to participate in the actual removal proceedings remotely from Vermont. I know the government has said that this is a procedural challenge or maybe a technical challenge because there's no remote participation capacity currently in the St. Albans facility. But in both cases, aren't they able to participate from Vermont in removal proceedings conducted before NIJ in Louisiana? They theoretically would be able to do so. We identified some operational harms that would come from that and those would also create irrecoverable costs. Irrecoverable costs are... But what more is there than just setting up a Zoom computer in St. Albans, Vermont? Is that the operational cost that the government's concerned about? There are operational challenges to that. You know, they have particular platforms and they are not set up to do so in Vermont. They have EORs set up in various ways and this would require departing from that in a way that's burdensome, as our declarances explain. But more fundamentally, whether this is fast or slow, the jurisdictional violations are the same and we think they inflict the same harms. Thank you. Thank you, Mr. Ensign. Thank you, Your Honors. We'll hear from Ms. Amath. Ms. Amath, you can lower the podium. There's a button to the side that lowers the whole thing. Good morning, Your Honors. Naz Ahmed, Main Street Legal Services. This is Petitioner Mr. Mohsen Mondawi. You are the first petitioner in the State of Louisiana I've already heard several arguments, so I'm happy to take questions. Can I ask, sorry, since you invited, I don't see you contesting appellate jurisdiction. Is that fair to say? That's correct, Your Honor. Okay. As this Court is well aware, in our society, liberty is the norm. Respondents seek to upset that norm for Mr. Mondawi and stay in order that has already been executed in order that the District Court decline to stay after making the appropriate findings. The State's pending appeal is an extraordinary reberry, particularly when somebody's liberty is at stake. None of the four factors favor Respondents. They have not shown that they are likely to succeed on the merits, nor can they show that they will be irreparably harmed to act as their present conversation showed. Rather, Mr. Mondawi and the public will be harmed if the State is granted. The government's retaliatory detention of Mr. Mondawi for approximately two weeks has already killed him and many others around the country who pray the same punishment should they dare to engage in protective expression disfavored by this Administration. As to likelihood of success on the merits, Mr. Mondawi, among other claims, challenges unlawful detention as violating the First and the Fifth Amendment. The Supreme Court precedent, which Your Honors have discussed very thoroughly this morning, and this Court's precedents all make clear that individuals may raise challenges to unlawful detention through habeas. None of the provisions the government points to, 1252G, B-9, A-5, prevent the District Court from considering claims challenging unlawful detention. The District Court considered these claims and determined it had jurisdiction. And the government does not dispute that it arrested and detained Mr. Mondawi because of his lawful speech. Or, I guess, they're not contesting, I forget what your second point, Judge Carney, but they haven't addressed it. And second, there will be no irreparable harm to respondents without a state. Respondents claim that they will be unable to effectuate the immigration laws that the state has granted unless he is detained. But that is patently untrue. Every weekday in this country, including today, across the street in 26 Federal Plaza, the Immigration Courts hear and consider thousands of removal proceedings for individuals who are not detained. In fact, Mr. Mondawi, the day after he was released, attended his first immigration court hearing via videoteleconference. His removal proceedings are able to continue longer. That happened, the government set that up? Or how is that facilitated? He was released, so he attended on his own laptop and via WebEx. Which would presumably be true if, I mean, the government cites to cost and logistical burdens in setting it up. I don't know why it would be on the government and not on your client to attend remotely, as you're indicating he did. If he's not detained. If he's not detained, yes, definitely. It's on the respondents to make sure they attend every immigration court proceeding. As I've said, the third and fourth factors, when the government is the opposing party, they collapse. The harm would be to Mr. Mondawi and others. The chilling of his speech and others. The fear and the broad show that others would experience if he were re-detained. So, I'm happy to take questions. I did want to point out a couple of things. Delgado did not involve detention, so I would argue that the holding of that is not so relevant here. And emphasize again that the decision to detain, or unlawful detention, is not known necessarily. Every day in this country, ICE initiates a local proceeding against individuals without detaining them. We would have serious suspension cost issues if a person were detained in violation of their First or Fifth Amendment rights, and they were unable to seek review of that unlawful detention. We're only able to seek review of that through a lengthy petition-proving process. You agree, though, that the government says 1252B9, that that bar applies to challenges to decisions to detain for purposes of removal. It says that the decision to detain is discretionary with the government. It's bound up in the decision to pursue removal. And there are certain circumstances in which statutes mandate detention, but others in which not within the government's discretion to do that. This is part and parcel of the commencement of removal proceedings, and therefore neither the District Court on Habeas, nor our court until after an immigration court had reviewed the whole proceedings, would have authority to assess the claims you're making. So, how do you rebut that argument? I would point to the fact that every day ICE initiates removal proceedings without detaining somebody. But the fact that it can adjudicate them without detaining someone doesn't mean that it doesn't have the authority in some circumstances to detain someone, right? Yes, but it doesn't have the authority to violate the Constitution. This discretion does not permit them to violate the Constitution. We are alleging that he is detained in violation of the Constitution. The immigration court would not have authority to review those constitutional claims, right? That's correct, Your Honor. So at what point would those be reviewable? Well, I would actually argue that the detention claims themselves would actually not be reviewable through the PFR process, because individuals who are challenging custody determinations do not form the record of proceedings that go up to the Court of Appeals when somebody is challenging a final order of removal. The decisions related to detention are separate, and they actually don't form a part of the removal order. And so there is, in one way, no way that they would form that part of the removal order. But even if Your Honor were to take that position that the review of claims that detention violated the Constitution were formed a part of the removal order that a Court of Appeals were to consider, that would be too late for anybody in Mr. McDowney's position or outside. They would have been subject to potentially unlawful detention. And the record— Why would it be too late? Sorry? Why would it be too late? For two reasons. One is that he would have already been subjected to the harms of unlawful detention. And in particular, the Supreme Court has recognized that even minimal amounts of time of First Amendment harms constitute irreparable injury. And so in particular here, where somebody is raising First Amendment claims, the courts should take that into account in terms of when something will become reviewable. Any other questions? I'm happy to answer any other questions. Do you agree generally that it's within the Attorney General's discretion to determine where a detainee is housed? Yes, but I again want to point the Court to the District Court's order, which is restricted to the length of the habeas proceedings. And I refer to Ms. Bondari's arguments with respect to the orders not to transfer him outside of Vermont, which at this point, you know, he's free, so they can't theoretically transfer him out. But the orders relate to the pendency of the habeas proceedings. They don't purport to say to the Attorney General, to ICE, no, you cannot transfer him during the entire legal proceedings. They don't purport to say the removal proceedings have to occur here. It's just for the purposes of considering the merits of the habeas proceedings. Can I ask, with respect to the TRO that bars removal from the country, can he be removed without a removal order? As a legal matter, I don't believe so. But as a factual matter, yeah, anything can happen. If you want to speak very briefly to the consolidation motion, you're welcome to. We have the papers. Well, I would say that for a couple of reasons consolidation is inappropriate here. One is that the different postures of the case. Ms. Osterk remains detained. Mr. Madawi is currently free. And the court's consideration of the different orders involves different analyses. Your Honor spent quite a bit this morning. We just did that. Sorry? We just did that. We just considered the issues in both cases. Well, I think – Did we do something we shouldn't have done? I think that there is one key difference here that I think is important, which is that Ms. Osterk is challenging the appealability of the – is not conceding that the transfer order is an appealable order. And that involves a different analysis than here where we're not conceding. I guess the question is we're perfectly clear that there – while there's considerable overlap, there are issues in common. So again, there are issues in common in both of these cases. And I haven't heard you discuss. So I'm interested in is there any substantive relief you believe you're entitled to so that consolidation would complicate? There is overlap in some issues. My only concern is that their interests are somewhat – not divergent at this point, but Mr. Madawi is free and Ms. Osterk is not. I mean, there are certain cases. And one has a custodian issue. There are other arguments lodged against Ms. Osterk that are not pertinent to Mr. Madawi's case, right? But what exactly are you worried about in terms of consolidation? Well, for Ms. Osterk – I can't speak for Ms. Osterk. I will speak just for Mr. Madawi. I don't believe that – analyzing the issues related to the appealable order and the custodian issues, those are things that this court needs to do for Ms. Osterk, but they don't need to do those for Mr. Madawi. And so to the extent that that makes things – speeds up a timeline or a decision for a stay of his release order, I would obviously argue against that. But if this court deems fit to consolidate them – You're concerned about delay? I'm concerned about delay. What in addition to delay are you concerned about? I – you know, again, I cannot – Ms. Madawi spoke for Ms. Osterk. I'm concerned about delay for her because she has a claim to be unlawfully detained.  That's really it. Understood. Thank you. To all counsel, the motions are submitted and we'll take them under advisement.